CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 1 0 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

RICHARD J. MORVILLO,                )
                                    )
        Plaintiff,                  )        Civil Action No. 5:07CV00046
                                    )
v.                                  )        **MEMORANDUM OPINION**
                                    )
SHENANDOAH MEMORIAL                 )        By: Hon. Glen E. Conrad
HOSPITAL, et al.,                   )        United States District Judge
                                    )
        Defendants.                 )

Richard J. Morvillo filed this diversity action against Shenandoah Memorial Hospital,

Valley Health System, Audrea H. Wynn, II, M.D., Jonathan F. O'Neal, M.D., and Stephen

Palmerton, seeking damages for injuries that Morvillo sustained during an anesthetic procedure

performed on June 30, 2005. On January 28, 2008, the hospital, Valley Health System, and Dr.

Wynn were non-suited from the case, leaving only Dr. O'Neal and Palmerton. The case is

presently before the court on the following motions: Dr. O'Neal's motion to exclude testimony of

plaintiff's rebuttal experts and designated testimony of plaintiff's experts (docket no. 230); Dr.

O'Neal's motion to exclude witness testimony and for partial summary judgment as to plaintiff's

claim for lack of informed consent (docket no. 233); Dr. O'Neal's motion to exclude testimony

(docket no. 240); Dr. O'Neal's motion to dismiss the second amended complaint and/or for

summary judgment (docket no. 262); Palmerton's motion to dismiss Count IV of the second

amended complaint (docket no. 264); Dr. O'Neal's motion to exclude testimony of plaintiff's

second supplemental expert (docket no. 275); and Palmerton's motion to exclude testimony of

plaintiff's second supplemental expert (docket no. 278).

## Factual and Procedural Background

On June 30, 2005, Dr. Wynn operated on the plaintiff's right rotator cuff at Shenandoah Memorial Hospital. The rotator cuff surgery was performed under interscalene block anesthesia. During the administration of the anesthesia, the plaintiff sustained an injury to his phrenic nerve, which resulted in the paralysis of his right diaphragm.

In his first amended complaint, the plaintiff asserted three claims under Virginia law against Dr. O'Neal, the anesthesiologist at the hospital, and Palmerton, one of the hospital's certified registered nurse anesthetists ("CRNA"). In Count I, the plaintiff alleged that Dr. O'Neal and/or Palmerton failed to provide the applicable standard of care and were negligent in the way that they treated the plaintiff, in that Dr. O'Neal and/or Palmerton crimped, bent, burst, and/or severed the plaintiff's phrenic nerve during the administration of the interscalene block. In Count III,[1] the plaintiff alleged that the defendants acted negligently, in that they failed to inform him of the risks associated with the interscalene block. In Count IV, the plaintiff asserted a claim for battery, alleging that the defendants failed to obtain his consent prior to the administration of the interscalene block, and that the defendants failed to obtain his informed consent.

On January 24, 2008 and January 25, 2008, respectively, Dr. O'Neal and Palmerton moved for partial summary judgment with respect to the plaintiff's battery claim. On February 13, 2008, Dr. O'Neal filed a motion for partial summary judgment as to the plaintiff's negligent treatment claim. In response to that motion, the plaintiff filed a motion for leave to file a second amended complaint that asserts a claim for vicarious liability against Dr. O'Neal.

---

[1] Counts III and IV are misnumbered in the plaintiff's first amended complaint.

2

Following a hearing on March 24, 2008, the court granted the defendants' motions for partial summary judgment as to the plaintiff's claim for battery. The court held that the failure to obtain a patient's informed consent does not give rise to a claim for battery under Virginia law, and that the plaintiff had no evidence to support his allegation that he did not consent to the performance of the interscalene block. As the court explained in its previous opinion, it is undisputed that the plaintiff initialed the anesthesia pre-op form, confirming that he would be undergoing an interscalene block with sedation.

The court also granted in part and denied in part Dr. O'Neal's motion for partial summary judgment as to the plaintiff's claim for negligent treatment. Because it is now clear from discovery that Dr. O'Neal did not perform the interscalene block, and that the interscalene block was likely performed by Palmerton, the court held that Dr. O'Neal was entitled to partial summary judgment to the extent that the plaintiff claimed that Dr. O'Neal personally provided negligent treatment. However, the court permitted the plaintiff to amend his complaint to include a claim for vicarious liability against Dr. O'Neal under the theory of respondeat superior, and denied Dr. O'Neal's motion for partial summary judgment to the extent that Dr. O'Neal argued that a vicarious liability claim would not be viable.

On April 29, 2008, the plaintiff filed a second amended complaint, which includes all of the original claims against Dr. O'Neal and Palmerton, as well as an additional claim for vicarious liability against Dr. O'Neal. Since the court previously dismissed the plaintiff's claim for battery, as well as the plaintiff's claim that Dr. O'Neal personally provided negligent treatment, the defendants have moved to dismiss those claims that are reasserted in the plaintiff's second amended complaint. Dr. O'Neal has also filed motions challenging the merits of the plaintiff's

3

informed consent claim and the plaintiff's claim for vicarious liability. Additionally, Dr. O'Neal and Palmerton have filed motions to exclude certain expert witness testimony.

The court held a hearing on the defendants' motions on August 7, 2008. All of the issues raised in the defendants' motions were addressed and ruled upon at the time of the hearing, with the exception of Dr. O'Neal's arguments regarding the merits of the plaintiff's informed consent and vicarious liability claims. Those claims are the subject of this opinion.

## Discussion

### I.  The Plaintiff's Informed Consent Claim

Dr. O'Neal has moved for partial summary judgment with respect to the plaintiff's informed consent claim. An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

4

Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252. Thus, "unsupported speculation . . . is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-412 (4th Cir. 1986).

In Count III of the plaintiff's second amended complaint, the plaintiff alleges that Dr. O'Neal and Palmerton failed to obtain his informed consent prior to the performance of the interscalene block. To support this claim, the plaintiff alleges as follows:

> Defendants, jointly and severally, had a duty to inform the Plaintiff
> of risks involved in medical, surgical, and/or anesthetic procedures
> that were to be performed on the Plaintiff, and the risks involved in
> performing these procedures on a person in his condition, and
> obtain his informed consent.

(2d Am. Compl. at para. 23). The plaintiff further alleges that the defendants failed to inform him of the risks involved in the medical procedures that were to be performed, and the risks involved in performing the procedures on a person in his condition, thereby breaching the standard of care owed to the plaintiff. Additionally, the plaintiff alleges that he was "caused to sustain serious and permanent injuries" as a direct and proximate result of the defendants' "failure to inform [him] of the risks involved in the medical, surgical and anesthetic procedures that were to be performed on [him], and the risks involved in performing these procedures on a person in his condition . . . ." (2d Am. Compl. at para. 25).

Under Virginia law, which governs this diversity action, the performance of a medical procedure without obtaining the informed consent of the patient gives rise to a claim for negligence. Dessi v. United States, 489 F. Supp. 722, 727 (E.D. Va. 1980). "As in any other

5

action based upon alleged negligence, the plaintiff must establish: (1) the existence of a duty; (2) breach of that duty; (3) proximate cause and (4) injury." Id.

In Tashman v. Gibbs, 556 S.E.2d 772 (Va. 2002), the Virginia Supreme Court held that "[a] physician has a duty in the exercise of ordinary care to inform a patient of the dangers of, possible negative consequences of, and alternatives to a proposed medical treatment or procedure," and that to prevail on an informed consent claim, "the patient generally is required to establish by expert testimony whether and to what extent any information should have been disclosed." Tashman, 556 S.E.2d at 777. The Court further explained as follows:

> A physician's duty of disclosure is defined with reference to the appropriate standard of care. We have defined the standard of care in a medical malpractice action as that degree of skill and diligence exercised by a reasonably prudent practitioner in the same field of practice or specialty in Virginia.
>
> A physician's deviation from the applicable standard of care must generally be established by expert testimony. Once a plaintiff has met the burden of establishing the standard of care and a deviation from the standard, [he] may establish by lay testimony that [his] physician did not disclose certain information regarding risks, and that [he] had no knowledge of those risks. As in other negligence actions, the plaintiff also must prove that the physician's negligent omissions were a proximate cause of the injury sustained.

Id. (internal citations and quotation marks omitted).

In moving for partial summary judgment as to this claim, Dr. O'Neal argues that the plaintiff has no evidence to support his allegation that the defendants failed to inform him of the risks associated with the performance of the interscalene block. During his deposition, the plaintiff testified that he has no memory of the defendants or the anesthetic procedure:

> Q.     Did you see any doctor before the surgery?

6

A.    I don't know if there were doctors there.  I don't know.

Q.    Did there come a time when they called you back into an area and your wife was not allowed to come?

A.    That's right, yes.

Q.    Tell me about that.

A.    They called me back and I got undressed.

Q.    What happened next?

A.    They brought me into surgery, I guess.

Q.    Do you recall if – did they give you any drug to make you relax?

A.    I don't remember.

Q.    Did anyone place an IV in your arm, if you recall?

A.    I don't recall.

Q.    Did anyone place an IV in your neck area?

A.    I don't recall.

Q.    Have you ever met Dr. O'Neal?

A.    No.

Q.    Have you ever met Mr. Palmerton, the nurse anesthetist?

A.    There were so many doctors or people there, I don't know who they were so I can't answer that question really.

Q.    Do you have any recollection of having a nerve block placed to block the pain before the surgery?

A.    No.

7

(Morvillo Dep. at 31-32). Upon being shown a copy of the anesthesia pre-op form, which states that the plaintiff was informed of the risks and benefits of the proposed anesthetic plan, and which contains the plaintiff's initials, the plaintiff testified that he has no recollection of reading or signing the form prior to surgery. The plaintiff also testified that he has no recollection of speaking with Palmerton. Nonetheless, the plaintiff acknowledged that the pre-op form contains his initials:

Q.     Do you recall having seen this document before?

A.     I never saw it, no.

Q.     There's a blank, if you go down the right-hand margin of the document, about three-quarters of the way down above the double black line, it says PT initials. Appears to be RJM written there.

A.     Yes.

Q.     Those are your initials. Did you make those initials?

A.     I guess so.

Q.     Does it look like the way you initial things?

A.     It looks like mine.

Q.     I take from your answer you have no present recollection of actually having done that. Is that fair to say?

A.     Yes.

Q.     Do you have any recollection of any conversation that you might [have] had with Mr. Palmerton preoperatively?

A.     No.

8

(Morvillo Dep. at 91-92).

To support his motion, Dr. O'Neal also emphasizes that there are no witnesses, aside from the plaintiff, who can provide testimony regarding the defendants' alleged failure to inform the plaintiff of the risks associated with the interscalene block. Bartley Hoffman, the nurse in the pre-operative holding area on the day of the plaintiff's surgery, was deposed on October 24, 2007. During his deposition, Hoffman testified that the anesthesia pre-op forms are completed in the pre-operative holding area of the hospital, and that family members are not permitted in that area. (Hoffman Dep. at 35-37, 78-80). Consistent with Hoffman's testimony, Florence Morvillo, the plaintiff's wife, confirmed that she did not accompany her husband to the holding area or anywhere past the initial intake area at the hospital on the day of the plaintiff's surgery. (F. Morvillo Dep. at 22-23). Mrs. Morvillo is the only person, other than the defendants, who the plaintiff has identified as a witness having "knowledge of the surgery which gave rise to this litigation." (Ex. 9 to O'Neal's Mot., Interrog. No. 15). Dr. O'Neal and Palmerton were deposed on October 30, 2007. While neither defendant specifically recalls the plaintiff, both defendants testified regarding their habit and practice of obtaining a patient's informed consent prior to the administration of anesthesia. (Palmerton Dep. at 36-37; O'Neal Dep. at 47-48).

Based on the foregoing, the court agrees with Dr. O'Neal that the plaintiff has no evidence to support his allegation that the defendants failed to inform him of the risks associated with the interscalene block. While the plaintiff argues that the issue of whether the defendants obtained the plaintiff's informed consent is one for the jury, since no one "recalls what happened in the instant case for certain," (Pl'.s Resp. at 2), a reasonable jury could only speculate as to whether the defendants informed the plaintiff of the applicable risks of the selected anesthetic

9

procedure. Because a motion for summary judgment cannot be defeated by "unsupported speculation," <u>Ash</u>, 800 F.2d at 411-412, the court will grant Dr. O'Neal's motion for partial summary judgment with respect to this claim.[2]

## II.    The Plaintiff's Vicarious Liability Claim

As previously stated, the court granted the plaintiff leave to amend his complaint to assert a claim for vicarious liability against Dr. O'Neal on the basis of respondeat superior, and denied Dr. O'Neal's motion for partial summary judgment to the extent that Dr. O'Neal argued that such claim would be futile. In so doing, the court explained as follows:

> The Supreme Court of Virginia has identified four factors that are relevant to the determination of whether a master-servant relationship exists for purposes of the doctrine of respondeat superior: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power of control. <u>Naccash v. Burger</u>, 290 S.E.2d 825, 832 (Va. 1982). "The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." <u>Id.</u> (holding that the evidence supporting the fourth factor, power of control, was sufficient to support the jury's finding that a master-servant relationship existed between a physician and a laboratory technician); <u>see also</u> <u>Schwartz v. Brownlee</u>, 482 S.E.2d 827, 829 (Va. 1997) (holding that the evidence of a defendant's power of control over a physician was sufficient to support the trial court's finding, as a matter of law, that an agency relationship existed between the defendant and the physician); <u>Boyd v. Bulala</u>, 877 F.2d 1191, 1197 (4th Cir. 1989) (holding that the evidence of the physician's power of control "was sufficient to justify the district court's instruction on agency and its submission of that issue to the jury").
>
> In this case, the evidence reveals that in June of 2005, Dr. O'Neal was the only anesthesiologist at Shenandoah Memorial Hospital. (O'Neal Dep. at 12). The hospital also had two CRNAs, Palmerton and Suzie Wang. (O'Neal Dep. at 19). The applicable

---

[2] Based on the court's decision, the court finds it unnecessary to address the adequacy of the plaintiff's expert reports with respect to this issue.

Virginia licensing regulation "requires that a CRNA be under the direction and supervision of a licensed physician when administering anesthesia." Blevins v. Sheshadri, 313 F. Supp. 2d 598, 600 (W.D. Va. 2004) (citing 18 Va. Admin. Code § 90-30-120). Consistent with this requirement, Dr. O'Neal testified that he supervises the CRNAs. (O'Neal Dep. at 36). Likewise, Palmerton testified that he works under the supervision of Dr. O'Neal unless "its's after hours and Dr. O'Neal has gone home." (Palmerton Dep. at 35). In such case, Palmerton works under the supervision of the surgeon performing the procedure for which anesthesia is required. (Palmerton Dep. at 35).

During their depositions, both defendants testified regarding the nature of their working relationship. Dr. O'Neal testified that he is "immediately available to [the CRNAs] while they are preopping and during surgery and in the post-operative procedure," and that he reviews the patients' medical records with the CRNAs prior to the administration of anesthesia. (O'Neal Dep. at 30-31). Dr. O'Neal testified that the hospital has two primary operating rooms, and that he goes back and forth between the two rooms when the CRNAs are handling the anesthetic procedures. (O'Neal Dep. at 33-34). Dr. O'Neal further testified that "[m]any times [he] will assist with anything that [the CRNAs] are doing." (O'Neal Dep. at 30).

Palmerton, during his deposition, testified regarding the pre-operative interview process. (Palmerton Dep. at 37). When Palmerton performs the pre-operative interview alone, "Dr. O'Neal will come in behind [Palmerton], introduce himself to the patient, tell [the patient] who he is, look over the chart, ask the patient if they have any questions or concerns, [and] if [Palmerton has] explained everything appropriately . . . ." (Palmerton Dep. at 37). After Dr. O'Neal speaks with the patient, and "if he agrees with [Palmerton], he talks to [Palmerton] about the particular type of anesthetic . . . chosen, . . . and then will sign the chart at that point." (Palmerton Dep. at 37) (emphasis added).

With regard to the procedure at issue in this case, the evidence reals that Dr. O'Neal was on duty when Palmerton administered the interscalene block on June 30, 2005, and that Palmerton was working under his supervision. The operating room schedule from that date indicates that Dr. O'Neal and Palmerton were assigned to the plaintiff's case, and both Dr. O'Neal and Palmerton signed the plaintiff's anesthesia pre-op form. Based on

11

the fact that the form contains his signature and the fact that he routinely speaks with patients prior to surgery, Dr. O'Neal testified that he most likely spoke with the plaintiff prior to the plaintiff's surgery. (O'Neal Dep. at 37, 51). Dr. O'Neal also testified that he "would have been in and out" of the plaintiff's operating room. (O'Neal. Dep. at 62).

Considering the evidence in the light most favorable to the plaintiff, the court finds that a genuine issue of material fact exists as to whether Dr. O'Neal had the power to exercise control over Palmerton on June 30, 2005, which would thereby give rise to a master-servant relationship. It is clear from the evidence that Dr. O'Neal supervised Palmerton on that date. Additionally, the evidence indicates that Dr. O'Neal most likely met with the plaintiff, reviewed the plaintiff's chart, and discussed the proposed anesthetic plan with Palmerton. While the evidence also suggests that Dr. O'Neal ultimately agreed with the proposed anesthetic plan, a reasonable juror could find, on the basis of Palmerton's deposition testimony, that Dr. O'Neal had the power to select a different type of anesthesia had he disagreed with that proposed by Palmerton. Based on the foregoing, the court finds that the evidence is sufficient to warrant submitting the issue of vicarious liability to the jury.

Morvillo v. Shenandoah Mem'l Hosp., No. 5:07CV00046, am. op. at 9-12 (W.D. Va. Apr. 16, 2008) (footnote omitted).

The plaintiff has now filed a second amended complaint. In Count V, the plaintiff alleges that at all times relevant to the complaint, Palmerton was acting within the scope of Dr. O'Neal's authority and under the supervision of Dr. O'Neal. The plaintiff alleges that Dr. O'Neal accepted the plaintiff as a patient and "was present at all relevant times acting in his supervisory capacity as to . . . Palmerton in the treatment and care of the plaintiff." (2d Am. Compl. at para. 32). The plaintiff further alleges that Dr. O'Neal "either directed and controlled the provision of anesthesia services to the Plaintiff, at all times relevant hereto, or he had the right to control the provision of said services to the Plaintiff by Defendant Palmerton." (2d Am. Compl. at para. 33).

12

Based on the foregoing, the plaintiff alleges that even if Dr. O'Neal "was not directly involved in the provision of anesthesia services . . . to the Plaintiff, he is nevertheless responsible therefore under the theory of respondeat superior for the actions or inaction of Defendant Palmerton." (2d Am. Compl. at para. 35).

In response to the plaintiff's second amended complaint, Dr. O'Neal has filed a motion to dismiss and/or motion for summary judgment with respect to Count V. In this motion, Dr. O'Neal makes the following arguments: (1) "The statutory scheme does not create a basis for liability of a supervising physician to a patient"; (2) "Plaintiff has not pled nor can he show that CRNA Palmerton was acting on the business of Dr. O'Neal or for Dr. O'Neal's benefit"; and (3) "There is no common law precedent under Virginia law for vicarious liability based solely upon the supervisory 'control' alleged here." (O'Neal's Br. in Supp. at 9, 17, 19). The court will address each of Dr. O'Neal's arguments in turn.

Based on the court's observation, in its previous opinion, that "[t]he applicable licensing regulation requires that a CRNA be under the direction and supervision of a licensed physician when administering anesthesia," Morvillo, am. op. at 10 (internal citations and quotation marks omitted), Dr. O'Neal first argues that the statutes and regulations pertaining to nurse practitioners and CRNAs do not provide a basis for imposing liability on a supervising physician. Indeed, the court agrees with Dr. O'Neal that a claim for vicarious liability against a supervising physician cannot be based on the relevant nurse practitioner statutes and regulations alone. See Prosise v. Foster, 544 S.E.2d 331, 333 (Va. 2001) (holding that the Virginia statutes pertaining to the professional relationship between medical students and their supervising physicians, standing alone, do not create a statutory relationship between patients and supervising physicians that

13

gives rise to a duty of care); <u>Monahan v. Obici Med. Management Services, Inc.</u>, 59 Va. Cir. 307, 314 (Va. Cir. Ct. 2002) ("As a matter of law, Monahan cannot assert a medical malpractice claim against Dr. Weinstein solely on the theory that the nurse practitioner statutes and regulations create an implied in law physician-patient relationship between them."). In this case, however, while the court cited to one of the regulations pertaining to the practice of nurse practitioners, the court did not rely upon that regulation to determine whether Dr. O'Neal could be subject to liability for Palmerton's alleged negligence. Instead, the court reviewed the common law theory of respondeat superior and the evidence revealed during discovery, and concluded that a genuine issue of material fact exists as to whether Dr. O'Neal had the power to exercise control over Palmerton, which would thereby give rise to a master-servant relationship. Thus, it is of no consequence, in this case, that the applicable nurse practitioner statutes and regulations, standing alone, do not give rise to a claim for vicarious liability against a supervising physician.

Dr. O'Neal next argues that an additional factor must be considered in determining whether a master-servant relationship exists for purposes of the theory of respondeat superior. Specifically, Dr. O'Neal argues that the plaintiff's vicarious liability claim fails because he cannot show that Palmerton "was acting on the business of Dr. O'Neal or for Dr. O'Neal's benefit." (O'Neal's Br. in Supp. at 17); <u>see</u>, <u>e.g.</u>, <u>Whitfield v. Whittaker Memorial Hosp.</u>, 169 S.E.2d 563, 567 (Va. 1969) ("In determining whether a person is the agent of another, it is necessary that he not only be subject to the latter's control, or right of control, with regard to the work to be done and the manner of performing it, but the work has to be done on the business of the principal or for his benefit."). The same argument was raised by the physician in <u>Naccash v. Burger</u>, 290 S.E.2d 825 (Va. 1982). In response, the Virginia Supreme Court explained that "the

14

quoted statement [from Whitfield, supra,] means only that the servant must have acted within the scope of his or her employment to render the master liable for the agent's torts." Naccash, 290 S.E.2d at 833. Consequently, assuming that a master-servant relationship existed between Dr. O'Neal and Palmerton on the date of the plaintiff's surgery, there can be no question that Palmerton was acting within the scope of his employment when he performed the interscalene block.[3] See Majorana v. Crown Central Petroleum Corp., 539 S.E.2d 426, 429 (Va. 2000) ("When the plaintiff presents evidence sufficient to show the existence of an employer-employee relationship [for purposes of respondeat superior], she has established a prima facie case triggering a presumption of liability. The burden of production then shifts to the employer, who may rebut that presumption by proving that the employee had departed from the scope of the employment relationship at the time the injurious act was committed.") (internal emphasis and citations omitted).

In his final argument, Dr. O'Neal contends that this case is factually distinguishable from the relevant decisions cited in the court's previous opinion, and that "[t]here is no common law precedent under Virginia law for vicarious liability based solely upon the supervisory 'control' alleged here." (O'Neal's Br. in Supp. at 19). While the court acknowledges that none of the decisions cited in the court's previous opinion involved the relationship between a CRNA and a supervising anesthesiologist, the court remains convinced that, in this case, a genuine issue of material fact exists as to whether Dr. O'Neal had the power to exercise control over Palmerton

---

[3] The court also notes that the plaintiff alleges in his second amended complaint that Palmerton was an employee and/or agent of Dr. O'Neal, and that Palmerton was acting within the scope of his employment at all times relevant to this action. (2d Am. Compl. para. 9). Thus, to the extent Dr. O'Neal argues that the plaintiff has not pled that Palmerton was acting within the scope of his employment, Dr. O'Neal's argument is without merit.

on the date of the plaintiff's surgery, and thus, that a jury should decide whether the defendants had a master-servant relationship for purposes of the theory of respondeat superior.

As explained in the court's previous opinion, Virginia courts, and courts applying Virginia law, have applied common law principles of vicarious liability, based upon an agency or master-servant relationship, in cases involving medical malpractice. Indeed, this court has previously recognized that while the Virginia Medical Malpractice Act contains no provision for vicarious liability, "traditional vicarious liability principles still apply so that, for example, a hospital might be held liable for the negligence of its employees under a master-servant theory." Peck v. Tegtmeyer, 834 F. Supp. 903, 907 n.3 (W.D. Va. 1992) (Kiser, J.); see also Charles E. Friend, Personal Injury Law in Virginia § 20.3 (3d ed. 2003) ("A physician may be held vicariously liable for the acts of others. This is usually based upon respondeat superior. This in turn requires a finding that the master-servant relationship existed, and that the servant was acting within the scope of the employment. Whether a master-servant relationship exists between the physician and the other persons is determined largely by whether or not the physician has the right to control the other person's actions.").

In Whitfield v. Whittaker Mem'l Hosp., supra, the Virginia Supreme Court first addressed "[t]he question of whether a nurse-anesthetist employed by a hospital is an agent of the surgeon when administering an anesthetic." Whitfield, 169 S.E.2d at 567. In addressing this question, the Supreme Court explained that "[i]n determining whether a person is the agent of another, it is necessary that he . . . be subject to the latter's control, with regard to the work to be done and the manner of performing it." Id. "Actual control," however, "is not the test; it is the right to control which is determinative." Id. (emphasis added) (internal citation omitted).

16

Applying these principles, the Supreme Court in <u>Whitfield</u> held that there was evidence from which a reasonable jury could find that the nurse anesthetist was the agent of the surgeon when administering the anesthetic. <u>Id.</u> at 567-568. The Court emphasized the surgeon had "supervisory control" over the nurse anesthetist, in that he "selected the kind of anesthetic to be administered, told her when to begin, and could stop it at any time." <u>Id.</u> at 568. Thus, the Supreme Court concluded that the issue of whether the nurse anesthetist was an agent of the surgeon was a question of fact, which should have been presented to the jury. <u>Id.</u>

In cases subsequent to <u>Whitfield</u>, the Virginia Supreme Court, and other courts applying Virginia law, have focused on whether a physician had the right to control a nurse or other health care provider's actions in determining whether the physician was subject to vicarious liability on the basis of an agency or master-servant relationship. <u>See, e.g., Naccash v. Burger</u>, 290 S.E.2d 825, 832 (Va. 1982) (holding that there was ample evidence to support the jury's finding that a master-servant relationship existed between a physician and a laboratory technician, where "the evidence was overwhelming that [the doctor] not only held the power to control [the technician's] actions but also exercised the power whenever necessary"); <u>Boyd v. Bulala</u>, 877 F.2d 1191, 1197-1198 (4th Cir. 1989) (holding that the evidence of the obstetrician's "power of control" over the delivery room nurses "was sufficient to justify the district court's instruction on agency and its submission of that issue to the jury"); <u>Lilly v. Brink</u>, 52 Va. Cir. 182, 185 (Va. Cir. Ct. 2000) (holding that whether an attending physician's control over a resident was sufficient for the purpose of respondeat superior was a "question more appropriate for the jury to decide," where the attending physician reviewed the resident's patient charts and had the power to order the resident to change a course of treatment); <u>Blevins v. Sheshadri</u>, 313 F. Supp. 2d 598,

17

603 (W.D. Va. 2004) (Jones, J.) (holding that whether a CRNA acted as an agent of a urologist when administering a patient's anesthesia was a question for the jury, where the hospital's policy implied that the urologist had the right to control the CRNA's method of administering anesthesia). Based on the foregoing case law, the court remains convinced, for the reasons stated in its previous opinion, that a genuine issue of material fact exists in this case as to whether Dr. O'Neal had the power to exercise control over Palmerton. Thus, the issue of whether Dr. O'Neal and Palmerton had a master-servant relationship for purposes of the theory of respondeat superior is one that should be decided by the jury.

In challenging the merits of the plaintiff's claim for vicarious liability, Dr. O'Neal also suggests that the Virginia Supreme Court's decisions in Whitfield and Naccash are "of no assistance in deciding the instant matter" (O'Neal's Br. in Supp. at 29), since those cases were decided before the Supreme Court's decision in Prosise v. Foster, 544 S.E.2d 331 (Va. 2001), and that the evidence in this case is insufficient to state a claim for vicarious liability under Prosise. For the following reasons, however, the court disagrees.

In Prosise, the plaintiff's four-year-old daughter, Crystal, died after allegedly receiving inadequate medical care from residents working at the Medical College of Virginia Hospitals Pediatric Emergency Room. Prosise, 544 S.E.2d at 331-332. The plaintiff filed a medical malpractice action against the attending physician who was on call when Crystal was examined by the residents, alleging that the attending physician was vicariously liable for the residents' acts and omissions. Id. at 332. The attending physician moved for summary judgment, arguing that she owed no duty of care to Crystal, since they did not have a physician-patient relationship. Id. at 332. The trial court granted the attending physician's motion, "finding that there was no

18

'minimum contact' between [the attending physician] and Crystal and, therefore, no physician-patient relationship existed." Id.

On appeal, the plaintiff argued that Virginia Code § 54.1-2961(B) "imposes a duty of care on an on-call attending physician in a teaching hospital because the statute requires that interns and residents 'be responsible and accountable at all times to a licensed member' of the hospital staff." Id. at 333. The Virginia Supreme Court rejected the plaintiff's argument, emphasizing that it could not "conclude that the General Assembly, in merely listing the conditions under which the medical students, interns, and residents may work in a hospital during the course of their educational programs, intended to create a statutory physician-patient relationship between an on-call attending physician . . . and a patient that would give rise to a duty of care." Id. The Court also rejected the plaintiff's argument that it should follow the North Carolina Supreme Court's decision in Mozingo v. Pitt County Mem'l. Hosp., Inc., 415 S.E.2d 341 (N.C. 1992), in which the Court held that an on-call attending physician had a common law duty to supervise residents. Id. Instead, the Virginia Supreme Court chose to follow the decision by the Maryland Court of Special Appeals in Rivera v. Prince George's County Health Dept., 649 A.2d 1212 (Md. Ct. Spec. App. 1994), in which the Maryland Court held as follows:

> [U]nless the "on call" agreement between a hospital and a physician provides otherwise, an "on call" physician who has not accepted a patient or has not, pursuant to his "on call" status, consulted with a treating or attending physician in regards to the patient, or has not been summonsed pursuant to his "on call" agreement to consult with an attending physician or attend or treat a patient, is not liable for the negligence of others occurring during the "on call" but unsummonsed period.

Rivera, 649 A.2d at 1232; see also Prosise, 544 S.E.2d at 334 (explaining that the Rivera Court "required that the evidence show that an on-call attending physician in a teaching hospital accepted responsibility for the patient's treatment in some way"). Applying Rivera, the Virginia Supreme Court ultimately held that there was no basis to support a finding that the attending physician accepted responsibility for Crystal's care, since the attending physician did not treat Crystal, did not participate in any treatment decisions regarding Crystal, and was not consulted by the residents or any other physicians regarding Crystal's condition, and since neither the attending physician's employment contract nor any other evidence in the record contained any information regarding the duties of attending physicians. Prosise, 544 S.E.2d at 334.

In the instant motion, Dr. O'Neal argues that the attending physician in Prosise "had equal if not superior 'power of control' over [the residents], given the applicable statutory scheme, to that which Dr. O'Neal had over CRNA Palmerton," and that the Virginia Supreme Court nonetheless "rejected any theory of liability as to [the attending physician]." (O'Neal's Br. in Supp. at 17). Consequently, Dr. O'Neal suggests that the power of control is not determinative, and that Whitfield and Naccash are no longer persuasive authority with respect to this issue. However, while Prosise indicates that the plaintiff asserted a claim for vicarious liability against the attending physician, there is no indication that such claim was based on the theory of respondeat superior or the alleged existence of an agency or master-servant relationship.[4] Thus, none of the elements relevant to the determination of whether such relationship exists, including the power of control, was discussed by the Supreme Court, nor

---

[4] The court notes that while "the term 'respondeat superior' is often used to describe the rule of vicarious liability which makes the principal liable for the act of the agent," respondeat superior "is not the only form of vicarious liability." See Personal Injury Law in Virginia at § 9.1.

were its previous decisions in Whitfield or Naccash. Consequently, the court is unable to agree with Dr. O'Neal's argument that Prosise "controls" the vicarious liability claim asserted in this case (O'Neal's Br. in Supp. at 29), or Dr. O'Neal's suggestion that the Virginia Supreme Court's previous decisions are no longer persuasive authority in light of Prosise.

In any event, even if Prosise controls the plaintiff's vicarious liability claim, as Dr. O'Neal contends, the evidence in this case is sufficient to create a genuine issue of material fact as to whether Dr. O'Neal "agreed to accept responsibility" for the plaintiff's care, Prosise, 544 S.E.2d at 334, and is therefore "liable for the negligence of others," Rivera, 649 A.2d at 1232. Both Dr. O'Neal and Palmerton signed the plaintiff's anesthesia pre-op form, and Dr. O'Neal signed the plaintiff's anesthesia record, indicating that he "was present for . . . and available during the case." (Ex. 3 to Pl.'s Resp.). Additionally, unlike the attending physician in Prosise, who "did not participate in any treatment decisions regarding Crystal," and "was not consulted by . . . any other hospital staff regarding Crystal's condition," Prosise, 544 S.E.2d at 334, the evidence in this case indicates that Dr. O'Neal most likely met with the plaintiff, reviewed the plaintiff's chart, and discussed the proposed anesthetic plan with Palmerton. During his deposition, Dr. O'Neal testified that he reviews the patients' medical records with the CRNAs prior to the administration of anesthesia. (O'Neal Dep. at 30-31). Likewise, Palmerton testified that when he performs the pre-operative interview alone, Dr. O'Neal will thereafter meet with the patient, look over the patient's chart, speak with Palmerton about the particular type of anesthetic chosen, and sign the patient's chart, "if he agrees with Palmerton." (Palmerton Dep. at 37). Based on the foregoing, the court remains convinced that the evidence is sufficient to warrant submitting the issue of vicarious liability to the jury. Unlike Prosise, in which "[t]he record

21

contain[ed] no information about the duties of attending physicians," Id., the record in this case contains ample evidence to survive summary judgment. Accordingly, Dr. O'Neal's motion to dismiss the second amended complaint and/or for summary judgment will be denied to the extent that Dr. O'Neal challenges the merits of the plaintiff's claim for vicarious liability.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This ___10th___ day of September, 2008.

_____
United States District Judge

Case 5:07-cv-00046-GEC-BWC   Document 290   Filed 09/10/08   Page 22 of 22   Pageid#: 3005